Turning to the next case on our calendar, which is Isaiah Doolen v. McCarthy, we'll hear from counsel. Good morning, Your Honor. My name is Ed Williams. I'm of counsel to the law firm Stuart Occupenti, and we reject the appellant Isaiah Doolen. We respectfully appeal the district court's dismissal of Doolen's claims under the APA, more specifically Section 706-2A and 706-2B, both of which fall as exceptions to the intermilitary immunity doctrine. As a result of the final agency action by the Secretary of the Army, Doolen was dismissed from the academy, separated from the military, and ordered to pay the government some quarter million dollars as recruitment for educational expense during his almost four years at the academy. The record before the court shows that $3,084.41 has been collected to the date of the filing of the administrative record. I can represent to the court that subsequent to that time, additional monies have been collected for a total of just under $8,000, $7,928.41 to be exact. That, of course, is the underlying basis for the constitutional claim, contrary to right under Section, the property right under Section 706-2B. The remedy we seek, Your Honors, is very limited. We simply ask this court to set aside and vacate the decision of the Secretary and remand the matter back to the Army for further consideration. In doing so, Your Honor, we do not seek to create new law or even extend existing law. Rather, we seek the court to apply existing law, and both this court and the Supreme Court. Let me consider the failure to follow regulations claims first, of which there were three. The government admits that West Point failed to comply with two of those three claims. They are Regulation 351, Section 114M, pertaining to the requirement that the staff judge advocate serve in the words of the regulation, its final review memo on the cadet so they can respond to it together with the commandant's recommendation. That was not done. The second regulation is... And further, Your Honor, doesn't Mr. Doolin claim that there were errors in that report that he never had a chance to correct? Oh, absolutely. And that goes to the prejudice, exactly. Let me discuss the prejudice of that right now before getting into the other admitted violation. The prejudice to Doolin on the SGA... Before you do, counsel, I would appreciate it if you would address the question of whether the failure to go to the board for the correction of military records means that there's no substantial prejudice here with respect to any errors because you have simply not availed yourself of a remedy that's available to you. Well, Your Honor, under the Administrative Procedure Act and under Section 704, as interpreted by Darby, and more recently addressed by Judge Bianco in the Belzer case, as well as Judge Haidt, which we addressed in the Manker case, I believe it was, there is no requirement to exhaust administrative remedies... What about Jones? ...following final agency action. What about Jones? I'm sorry? Well, addressed both Judge Bianco and Judge Haidt, sitting by designation in Connecticut, both of them said that Jones, which was a Section 1983 case, and Guitard earlier decided before Darby, in the words of Judge Bianco and Judge Haidt, quote, are of no moment. I really don't have anything more to add to the very good analysis about Judge Bianco. Counsel, does Darby overrule Guitard? I'm sorry? Does Darby overrule Guitard? It's a different channel. Darby deals with the APA. We don't know. The record is unclear whether Guitard was an APA case or a Section 1983. It's unclear. Cases have suggested Guitard was a 1983 case, but in any event, Darby was decided subsequent to Guitard, and the analysis in Crane Plus is very solid. There has been no case, no case, other than a very early on case in the Southern District of California, which has held that one must go to the ABCMOR following federal action unless there's a statute that requires you to do so, or unless there's an agency rule which requires it, and that the administrative action is held inoperative during the pendency of that review. Not one case. Counsel, maybe to go back to Judge Pooler's question about, well, I guess where you started about the JAG report not having been served on the cadet, my understanding is that one of your claims is that the cadet was not able to respond to the DWI allegation, right? Yes, in the Robinette memo, there were, in addition to errors, which Doolin would have replied to on the factual statement of the case, and he would have replied to and rebutted to it had he had the opportunity. Let me ask you that, because I guess my question is, prejudice means something that you would have proven, if you're going to show prejudice, you're going to show it hurt you not to have the opportunity to respond, and I don't see where in the record the cadet says, well, if I had had the opportunity to respond to the DWI, I would have shown that it wasn't a negative factor because. I don't see how you can show prejudice just by saying, well, I didn't have the opportunity to respond. I'm not going to tell you what I would have said to respond, but I bet it would have been a really good response. Now, maybe I missed it, and maybe he said what he would have said and how he would have rebutted that. Maybe you can tell me in a little bit more detail, what exactly is the prejudice? In other words, how would you show a reasonable likelihood of a different outcome for him had he had the opportunity to respond? Judge, the first time Doolin and counsel, me, even saw the Robinette memo was when the No, I understand what you're saying. You didn't have a chance to respond. What I'm saying is what's the prejudice from not having had the opportunity to respond? He would address the three things in the Robinette memo. Right. How would he have addressed it? I understand you say he would have responded, but if he would have responded by saying, yes, I got a DWI, then it's a no harm, no foul. So what's the prejudice? It's not this court's, it is not up to this court to decide whether or not he was required to respond to the DWI or not. First of all, the DWI was eventually dismissed, but he had no, he had no opportunity to. You're not addressing the guts of this. You're just talking, you're not addressing the guts of this. The man, let's focus on the DUI. He gets arrested for driving under the influence. Is that accurate? He was stopped and arrested. Yes. Okay. Did he have an obligation to report that arrest to his superiors? He did not. There's no regulation that says that. The government points to some regulation pertaining to officers that they should be good officers and good people as the basis for saying he should have reported it. There's no regulation saying that. He would have addressed that had he had the opportunity. He was also accused of using heroin in the barracks. Look, we're not talking about heroin right now. We're talking about a DUI. So your position is that he was prejudiced because he would have argued that, yes, I obligation to tell anybody that I've been arrested, even though I'm a West Point cadet. And by the way, the DUI was eventually dismissed. That's your position. Yes. I would add something to that, Your Honor. The time he was arrested was in August 2013, when he had been wrongfully suspended from the academy by West Point, which judgment was overturned by the secretary because they failed to give him due process. He was home on suspension. We understand all that. The fact, it would seem to me and I'd be interested in due course to hear from the government its view on whether he was obliged to report it. I would think it relevant in determining whether a cadet is fit to go forward at West Point and become an officer of the United States Army, had an arrest for DUI, especially if he didn't report it and was obliged to do it. Well, we don't know whether he was obliged to do it. There's been no determination by anyone. I understand that's your position. We'll see what the other side has to say about that. If he had an obligation to report it, do you agree that the fact that the DUI was eventually dismissed doesn't establish prejudice for his inability to meet the accurate contention on my hypothetical that he failed to report the DUI arrest? We contend there was no obligation. I got that every time you told me. And that is not for this court to decide. He just had no opportunity to report, reply to anything in the Robinette memo. Nothing. So let me ask you another twist on this question. If we were to determine, as I think the district court did, that even if the cadet had had an opportunity to respond to the DUI, and let's say make the points that you just made now, that there's no reasonable likelihood that there would have been any difference in the secretary's determination, because it was really based on all the misconduct. For example, barging into a female cadet's barracks drunk, restraining her from leaving her room, preventing her from reentering her room, after quite a long history of demerits at the academy. So I guess, tell me why the district court erred in finding no prejudice here. In other words, why is it that you contend that, yes, absolutely, had your client had an opportunity to make the points you're making about the DUI, that the cadet would not have been expelled from the academy and told to pay recruitment? Why would that have made a difference to the army secretary's decision? Your Honor, there is no regulation that he violated. There was no obligation to report. Right. So that's what I'm saying. Let's assume that's true. Let's assume that you're right. And why do you think it was prejudicial? Why do you think that that was a big enough part that it would have changed the secretary's mind had they known that? Because then there would be no basis, no basis, factual or legal basis to separate him based on that position. But I separated him based on everything that happened. I thought that the recommendation came up based on everything that did not include the DWI. He never, you know, I see my time is up and I never even got an opportunity to talk about the due process violation. He never had a hearing. We have your briefs and they're very thorough on that. Do you have some time for rebuttal in any event? Did you want to answer the question before you? Yes, Your Honor. Could you repeat the question, please? I'm sorry if I missed it. No, I'm sorry. My question was, my understanding is that all the procedures that had happened before the staff JAGS report were based on all of the cadets misconduct at the academy, right? So the recommendation had gone up all the way up the chain without taking consideration of this DWI. That was a late breaking addition, right? In the staff JAGS report that it seems very clear was not served on your client. So you didn't get it. He didn't get a chance to respond to that. My question is given the fact that all of this decision making up to that point had been based on his academy based misconduct. Why should we be left with the view that if only he had a chance to respond to the DWI that had never up to that point made a part, played a part in anybody's decision making that would have changed the view of the Army. Not only the DWI, but the heroin accusation and the assault accusation. All of those were in the Robinette memo. And of course, the commandant did not give his rationale either. The conduct hearing is not a hearing on separation. It's merely a hearing to determine whether or not the cadet is deficient in conduct. Then it goes up the chain of command. And what we allege is that he had no hearing on separation when he had come back rehabilitated and the record, the actual transcript of the hearing, not the made up summaries of the hearing officer should have prevailed and that there was no proponents of the evidence to send it up the chain of command. All right. But this is a good place to end. You reserve three minutes from rebuttal. We'll hear from the secretary. Good morning, Your Honors. Peter Aronoff, U.S. Attorney's Office, Southern District of New York for the government and government officials. The military is a separate community from civilian society with its own requirements and systems for enforcing good order and discipline because order and discipline are essential for the military to function effectively. And recognizing this difference, this court has repeatedly held that in general, Article III courts lack jurisdiction over matters of military discipline. There are only two exceptions to this rule of non-justiciability. The first is a facial constitutional challenge to military procedure. And the second is a claim, as the court has been discussing, that the military did not follow its own mandatory regulations and that that was to the plaintiff's substantial prejudice. The appellant here has sought to shoehorn his arguments into those two categories. But at base, this is a case about West Point's discretionary decision to separate him from the Army. After a formal hearing, experienced military officers determined that appellant's repeated misconduct, his mediocre academic record, and his poor attitude made him unfit to serve as an officer. And this court should not second guess that judgment. I think it may make sense, unless there are immediate questions, to turn to the questions that the court has raised about the legal review, which I know are a focus of the appellant's briefs. To be clear, there are three different arguments that the plaintiff makes here. So the first is about, essentially, the weight of the evidence. And as we explained in our briefs, and as the district court found, for this court or any Article III court to involve itself in a fact-specific inquiry about which way the evidence pointed would undermine the doctrine of military, intramilitary non-justiciability. So that argument, we think in the first place, is not appropriate for Article III review, but in any event, substantial evidence supported the decision of the cadet's military superiors. The other two arguments that appellant raises are about matters that were contained in the conduct investigation in which appellant claims that he didn't have a chance to respond to. So the first of those is a set of allegations from Mr. Doolin's ex-girlfriend that culminated in a family court proceeding. But the record reflects, this is at the Joint Appendix, pages 93 to 97, that Mr. Doolin, through counsel, kept West Point apprised of developments in that case, including a voluntary notice of dismissal before any decision was rendered. So there's no substantial prejudice to Mr. Doolin because he was able to notify the army of the dismissal of that case. And beyond that, there's no record that any decision maker considered or relied on the no substantial prejudice to Mr. Doolin. What about the DWI? So the DWI charge, in that instance, the record shows the superintendent's decision did consider the DWI, but only to a limited extent. So the superintendent said that he did not consider the substance of the charge. In other words, what, you know, the ultimate disposition, whether Mr. Doolin was found guilty or found to have a violation. Instead, he only considered the fact that Mr. Doolin had not reported his arrest. And as counsel has just stated, Mr. Doolin does not contest that he was arrested and did not report that fact. Well, that's because the army is interested in character rather than other things. And not reporting the arrest was a question of his character. Is that what you're telling us? Yes. At base, the decision of whether Mr. Doolin should be separated or not is a very discretionary decision left to the army itself about who is fit to serve and which cadets would be officers whose service would be in the best interests of the United States. Mr. Aronoff, was there a specific articulable legal duty to report the arrest, or was it simply the fact that non-reporting was viewed as inconsistent with the character desirable in a military officer? I'm not aware of a specific requirement of legal duty for him to report. So instead, the basis was, and we cited in our brief, the duty for commissioned officers to be forthright. And in general, cadets are held to a code of conduct, the same code of conduct that Mr. Doolin was held to have violated repeatedly. And the trust that military officers are given to lead troops potentially in combat is an important consideration for the army. And it was not, under these circumstances, unreasonable for the superintendent to consider effectively a lack of candor when he was evaluating what would be in the best interests of the United States and the United States Army. So to reiterate, on these arguments about the mandatory regulations, if the court considers these arguments, there is no prejudice to Mr. Doolin that he has identified. Before the court reached that question, there's a threshold question, which Judge Kaplan had raised, about whether those claims are even justiciable. And this court held in Jones, a 1999 decision adjudicating a Section 1983 challenge, that the doctrine of intramilitary immunity includes. So let me start that again. In considering which claims are justiciable in the first place, the mandatory regulations exception to intramilitary immunity includes a requirement of exhaustion. That was a 1983 case, but 1983 and the APA are relevantly similar in that both of those statutes, there are Supreme Court decisions, Darby and Patsy, stating that there is no exhaustion requirement before a plaintiff may come to court. So the Jones court reasoned that notwithstanding... That was a 1983 case, correct? Correct. Jones is a 1983 case dealing with state military service. But the rule is relevantly identical because both 1983 and the APA have a general rule that a plaintiff need not exhaust administrative remedies before coming to court. Notwithstanding that general rule in Jones, this court held that, specifically in the military context, there is a logically prior rule, which is that one cannot bring a 1983 challenge to questions of military discipline at all. And the only way that a plaintiff may come to court is by fully satisfying the requirements of the mandatory regulations exception to the general rule of non-justice ability. And within that exception, the court held that a plaintiff must exhaust his administrative remedies under reasoning that is familiar when considering military cases. If a plaintiff goes through the military's own procedures, that minimizes the interference that the civilian court might have on matters of military discipline. And so, concededly, Jones is a 1983 case, but the same... Again, the rules are relevantly similar for the APA. In the APA, Darby held that, in general, a plaintiff need not exhaust administrative remedies before coming to court. But since the doctrine of inter-military immunity applies equally to 1983 and APA cases, this court has already decided this question in Jones. In other words, there's no basis to distinguish between 1983 and the APA. Jones was a published decision of this court. And so, the decision has already been made. Just to be clear, could you just state for us, concisely, what would have been the regulatory course that, in the government's view, the cadet would have been obliged to take in this case? Yeah, so the Army Board for the Correction of Military Records, which is a civilian review board and which does have jurisdiction over recoupment questions, we cited some examples of recent cases in our brief where separated cadets have challenged a recoupment decision. Plaintiff should have gone to the Army Board for the Correction of Military Records first and exhausted the procedures before the board. Following those administrative procedures, the plaintiff would have had a right to go to an Article III court to review the board's decision, but not to bring a freestanding challenge to the initial decision by the Army. Continue. Thank you. I'd also, unless there are further questions from the court about the mandatory regulations arguments, I would like to briefly address the facial constitutional challenges that plaintiff makes. So, plaintiff's argument on the facial constitutional prong of these cases is that to intermilitary immunity is that West Point's procedures did not specifically provide for a hearing on separation. So he concedes, and it is the case that West Point's procedures provide for an elaborate hearing with live witness testimony, the opportunity to cross-examine, submission of written evidence on the question of whether a cadet is deficient or proficient in conduct. But it is true that there is no live hearing on the subsequent question, which is, if a cadet is found deficient in conduct, what is the sanction that should result? But this court's decisions from the 60s and 70s addressing military separation do not separate a cadet from the rest of the military, nor do any Supreme Court cases. Instead, here, the procedures that West Point provides include the live hearing on a closely related question of deficiency or proficiency in conduct. And the question of whether a cadet should be separated depends on an overall evaluation of the cadet, which includes things like his academic record, which is naturally in writing. Evaluations from faculty, which again, those are commonly given in written form in everyday life, and it would be burdensome to have to call a large number of faculty members to provide those kinds of references. And the cadet is still permitted to provide written evidence on the question of whether he should be separated. And here, the record shows that Mr. Doolin provided a seven-page statement of his own, 180 pages of exhibits, and an additional 15-page letter from his counsel. So to suggest that that fulsome opportunity to provide evidence on this question of whether he should be separated violates due process, I think, misunderstands the procedures that not only were available, but that Mr. Doolin was able to take advantage of here. As we argue in the briefs, there's also the separate opportunity to, after an adverse decision, to go to the Civilian Review Board, which potentially would have afforded him a further chance for a hearing. So in light of all of those procedures that are in place, there is no facial due process violation with this. Would the Army Board have been empowered to review the separation issue? So I understand. It certainly could have reviewed the recoupment question, and I understand from the Army that it also could have vacated the separation decision. Now, assuming that to be true, isn't that fatal? That is to say, isn't the failure to go to the Army Board fatal to a facial challenge where the issue is whether there is any conceivable set of circumstances in which the Army would have afforded him a hearing, a live hearing, on separation, and there is a conceivable circumstance? The Army Board could have done so. Yes, I think that that is a correct conclusion. So he might have gone to the Army Board and asked for hearing. The Army Board may have said no, and then he might have had an as-applied challenge. But it does defeat, doesn't it, the facial challenge? Yes. Under the Salerno test and similar cases, it is not the case that there is no set of circumstances under which the procedures that were available to him would have sufficed, even on his understanding of those procedures. And I'll also note, an as-applied challenge is not justiciable under the Inter-Military Community Doctrine. I see. All right. Thank you. Thank you, Mr. Aronoff. I will turn to Mr. Williams, who has three minutes for rebuttal. Let me address the constitutional issues first. There's a facial attack, not an as-applied attack. And the Army Board of Corrections for Military Records has no authority to declare unconstitutional regulation and provide the relief that Doolin seeks. But in the first place, there was no— Is the question whether they had the authority to declare regulation unconstitutional, or whether they had the authority to give him a live hearing with witnesses and vacate the separation and recruitment decision? I guess that's—well, that's my question, at least. I think that is the question, but at least that's my question. They can only—the ABCMR can only make a recommendation to the Secretary of the Army, who has already ruled against him. They have no authority independently. All they can do is recommend to the Secretary, who has already made the decision. And can they do that after affording a live hearing? Yes, if they give him a live hearing. But there's no obligation for the Secretary to accept the recommendation of the ABCMR. It's not like an Article 78 proceeding after a Section 1983 case. It's very different. But there's more process to be had. I'm sorry? There is more process out there that the cadet could have availed himself of that he chose not to, is the point. That was not the end of the regulatory line, is the point, right? But under Judge Bianco's decision, and Judge Haight's decision, and Manker versus Spencer— Well, last I checked, those decisions weren't Second Circuit decisions. Are those decisions binding on us? There is no Second Circuit decision on this issue, correct. But there's a Ninth Circuit case, there's a D.C. Circuit case, there's a Tenth Circuit case, all rejecting the argument made by the Army, both in Guitard and before Judge Haight, and before Judge Bianco and in Belzer. Salerno doesn't apply. Salerno applied to a statute, not a regulation. We haven't even begun to address the prejudice to Doolin by the Commandant's failure to provide his rationale, which is admitted, that the Commandant did not provide his rationale. I point to Judge Friendly's commentary in his famous essay that cadets should have to, individuals should have to know the grounds, the rationale, based on which the recommendation is made. Other quick points, the Matthew V. Eldridge factors, all three of them sit in favor of Doolin. Hagobia, this court, Judge Mansfield, an Army person, held that at a hearing, before Army officials who will make a determination whether a cadet shall be suspended or retained, shall have the right to appear, be present, and present witnesses. Doolin was never given that opportunity. West Point's regulations do not provide for that opportunity. Look at page A-1000 for that regulation, which specifically says that at conduct hearings, you shall not give testimony, nor will testimony be received, based on retention versus separation. That determination will be made by the Commandant based in writing, in written submissions, which is exactly what Judge Mansfield said was wrong in this court's decision in 1972. Hagobian, yes. In Hagobian, doesn't Hagobian still stand? It's still good law. It's still good law. It's a little old, but so are the rest of us, so go on. Quick points of rebuttal. Reading my own notes. The prejudice, it only requires one of the three rule regulations to have this court vacate. On the failure of the hearing officer to apply the preponderance of the evidence, the evidence was in the transcript, in the verbatim transcript. The hearing officer did not base his findings based on the transcript. He based his findings based on made-up summaries that bore no relation to the transcript. In fact, the transcript wasn't even prepared at the time, and the findings of the hearing officer, as I said, were based on his made-up summaries, which were put to a lie when the transcript was found. Wasn't the hearing officer there during the testimony? He, yes, he was there, but he was- So let me ask you this, if a district court were to preside over a suppression hearing and to rule from the bench at the conclusion of the hearing in favor of one party or the other, and the transcripts were prepared subsequently, you would take the view that the district court did not base the decision on the evidence? Your Honor, criminal law is outside my pay grade, so I- Take a civil case. Take a civil example. A district court hears evidence, rules from the bench, the transcripts are prepared, you know, within a month or two afterwards as someone prepares an appeal. You're saying that you would advance the proposition that the district court did not base its decision on the evidence, because even though the district court was there and it had to subsequently read the transcripts. I guess I'm trying to understand, is that your point? It is not, Your Honor, because it's different. Here there is a specific regulation, army regulation, mandates, mandates, it's section 116A, mandates that the hearing officer, the conclusions, the findings must be based on the preponderance of the evidence. What I'm saying is that the evidence is in the transcript. That's a standard of proof. That is a standard of proof. That is not saying one must forget everything one's heard and now go back and only read the transcript. That's a question of the source of the evidence. The preponderance of the evidence is more likely than not. There is no reason why the transcript couldn't been prepared and have the hearing officer make his findings based on the transcript, which is the evidence rather than his faulty recollection or maybe biased recollection. Maybe perfect recollection. I'm sorry? Or maybe perfect recollection. Could be, but we know it's not when you look at the transcript. Counsel, your time has long expired. In conclusion, do you have something to say in conclusion? In conclusion, based on the failure of West Point, admitted failure to comply with two of the mandatory regulations and the unconstitutionality of the existing procedures of West Point, which do not provide for the hearing that was required by this court, you have established procedures at West Point. They're established. Under Zimmerman, under Cleveland, you have to give a pre-deprivation hearing regardless, regardless of the viability of post-deprivation procedures. That was not done. Thank you, counsel. And of course, you have the Matthew V. Eldridge factors, which all tip in the favor of having West Point be required to have a pre-deprivation hearing, which is not admittedly not done. Thank you both. We'll reserve decision on this interesting case. I'm turning to the next case on our calendar. Thank you, your honors.